# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LORENZO ASTROGA CORRAL,<br><br>　　　　　　　Petitioner,<br><br>　v.<br><br>JOSH TEWALT, Director, Idaho<br>Department of Correction,[1]<br><br>　　　　　　　Respondent. | Case No. 1:17-cv-00207-BLW<br><br>**MEMORANDUM DECISION<br>AND ORDER** |

Earlier in this matter, Respondent Josh Tewalt moved for dismissal of Petitioner

Lorenzo Astroga Corral's Petition for Writ of Habeas Corpus on procedural default

grounds. (Dkt. 12.) The Court concluded that the claims in the Petition were procedurally

defaulted, with the possible exception of Claims 3(a) and 3(b). (Dkt. 25.)

The Court permitted Petitioner to file (1) a response to the Court's Order to argue

that an exception to procedural default should be applied, and (2) an amended petition to

provide factual support for Claims 3(a) and 3(b) so that the Court could better determine

whether the same claims had been presented to the Idaho Supreme Court. (Dkt. 25.) No

---

[1] Petitioner has been transferred to a Texas facility. The Court has substituted as Respondent the Idaho Department of Correction Director, the legal custodian of Petitioner. *See* Rule 2(a), Rules Governing Section 2254 Cases; *Rumsfeld v. Padilla*, 542 U.S. 426, 434-35 (2004) (the custodian "is 'the person' with the ability to produce the prisoner's body before the habeas court.").

other claims were to be included in the amended petition, and any procedural default, cause and prejudice, and miscarriage of justice arguments were to be presented in the response to the Order, not in the amended petition. (*Id.*)

Petitioner has since filed a Supplemental Petition (Dkt. 29) and has given notice that he will not be filing a response to the Court's Order to contest the procedural default of the majority of his claims. (Dkt. 30.) The Court takes judicial notice of the records from Petitioner's state court proceedings, which have been lodged by the parties. *See* Fed. R. Evid. 201(b); *Dawson v. Mahoney*, 451 F.3d 550, 551 (9th Cir. 2006). Having reviewed the motions, responses, and the record in this case, the Court enters the following Order denying and dismissing the case.

## STATE COURT RECORD

Several months after Petitioner filed his Supplemental Petition, he requested a copy of Respondent's Lodging so that he could use the same numbering system as Respondent. (Dkt. 31.) It is not necessary for Petitioner to use the same numbering system. Petitioner is entitled to a copy of the particular docket pages that Respondent references in any filing requesting dismissal or denial of Petitioner's claims and the parties' briefs and the state appellate court opinions on post-conviction review. *See* Rule 5(c) and 5(d) of the Rules Governing § 2254 Cases. Where additional briefing is required, the Court will take additional steps to provide the petitioner with additional records, but the Court first requires the petitioner to provide notice about which parts of the record he has obtained from his former counsel and which he lacks. Here, it appears from

Petitioner's filings that he has the portions of the state court record relevant to his two remaining claims. (Dkt. 29, Exhibits.) In addition, no further briefing is required for disposition of the claims in the Petition. For these reasons, the motion will be denied as moot.

## WHETHER THE CONDITIONAL GRANTING OF THE MOTION FOR SUMMARY DISMISSAL SHOULD BECOME FINAL

Because the Court determined that all of Petitioner's claims are procedurally defaulted, with the possible exception of Claims 3(a) and 3(b), and Petitioner has elected not to contest that determination by filing a response (Dkt. 30), the Court first dismisses the uncontested claims with prejudice on procedural default grounds

## BACKGROUND

Petitioner stands convicted by jury of conspiracy to commit first degree murder and conspiracy to commit first degree kidnaping. An investigation into Petitioner's plans was prompted by a police-station confession of Krystn Sanchez, who had been living with her boyfriend Jose Rodriguez in Petitioner's house.[2] Krystn told police that Petitioner had solicited their help to murder Edgar Maldonado, the man Petitioner thought his ex-girlfriend Dania Santos was dating. In its notice of intent to dismiss the post-conviction petition, the state district court described the factual and procedural history of this case as follows:

---

[2] Sometimes in the record Petitioner' house is described as being in Caldwell, and sometimes in Nampa. Its correct address was 3610 South High Springs Street, Nampa, Idaho.

According to the trial testimony, Petitioner was unhappy that his ex-wife, Dania Santos, had begun dating other men. Dania was forced to get a no-contact order against Petitioner shortly after the two separated. Dania had become friends with Edgar, as both were from Honduras. The pair had dinner with other people from Honduras on several occasions, and Petitioner was aware that on one occasion, Dania and Edgar had gone dancing. The night after the two had gone dancing, Petitioner had driven by Dania's apartment at approximately 11:00 p.m. to see if she was home.

Petitioner then began talking to his roommates – Jose and Krystan[3] – about killing Edgar because of his relationship with Dania. Petitioner offered them $5,000 if they would help him kill Edgar. Petitioner bought a gun and practiced shooting it with Jose. The plan was for Petitioner and Jose to first steal Dania's car, which they would hide at Krystan's trailer in Meridian. They would then sell the car and use the money to leave the state. After they stole Dania's car, Krystan would drive her own car out past Greenhurst and Blackcat, a relatively rural location. She would then call Edgar, a mechanic, to see if he would come fix it. Though she had never met Edgar, Krystan got his number from Petitioner. Krystan testified that Petitioner told her to use whatever means necessary, including the promise of sexual favors, to lure Edgar out to her car. Jose and Petitioner would be parked along the way and when they saw her and/or Edgar drive past, they would follow. Petitioner was going to hit Edgar with a metal bar and then Jose was going to shoot him. They planned to dump the body in the river. They would then sell Dania's car and flee the state.

On the evening of June 12, while Krystan remained at the house in Caldwell, Petitioner and Jose stole Dania's car and drove it back to Petitioner's house. Krystan loaded some of her clothing into the car, Jose gathered some of his papers, and the two began the drive to Meridian in the stolen car. En route, Jose crashed into an irrigation ditch and wrecked the car. Krystan and Jose got out of the car and called Petitioner,

---

[3] The majority of the court record reflects that the roommate's name was spelled "Krystn," rather than "Krystan." In police interviews and at trial, both Dania and Jose called Krystan "Christina," sometimes transcribed as "Krystina." *See, e.g.*, Dkt. 29-4, p. 408.

who came and got them and brought them back to the house they all shared. Krystan, at Petitioner's direction, sent Edgar numerous texts and called several times between about midnight and the early morning hours of June 13. During this time, she and Jose drove back to the trailer in Meridian but returned to the house in Caldwell relatively quickly, either to get more bedding or because Petitioner had called them.

Not surprisingly, Edgar did not respond to the texts or the phone calls made in the early morning hours, so the next morning, Petitioner drove Krystan past the home where Edgar lived and instructed her to go to the house to find out if he was home. Petitioner wrote the address on a scrap of paper and gave the address to Krystan. Krystan went to the house but Edgar, having become suspicious, told his roommates to say he wasn't home.

Krystan then returned to the house she shared with Petitioner and continued to text and call Edgar. At some point, Krystan and Jose no longer wanted to be part of the plan to kill Edgar. They took the gun and hid it underneath the mattress in the room they were sharing at Petitioner's house in Caldwell. They took the box of shells back to the trailer in Meridian. Krystan then texted Edgar and told him to be careful. The night of June 13, she went to the police and reported the plan to kill Edgar.

Her story was met with some skepticism and the officers asked her to get the gun. Krystan went to the house in Caldwell that she shared with Petitioner, retrieved the gun from under the mattress, and took it back to the police station.

Although not entirely clear, it appears the police then obtained a warrant to search Petitioner's house and truck. In the truck, the officers found a spent shotgun shell matching the gun and some duct tape. In the garage, the officers found the metal bar. Krystan consented to a search of her trailer, where the officers found the box of shotgun shells and Jose's muddy shoes. Also, the officers recovered the slip of paper with the address, though it is unclear whether it was obtained from Krystan or located during the search of her trailer. Petitioner was arrested and charged with conspiracy to commit first degree murder and conspiracy to commit first

degree kidnapping. Krystan was not charged, and Jose ultimately pleaded guilty to one count of aggravated battery and was sentenced to prison in exchange for his agreement to testify against Petitioner.

(State's Lodging C-1, pp. .54-57.)

## REVIEW OF SUPPLEMENTAL PETITION

In this action, the Court permitted Petitioner to file an amendment clarifying Claim 3(a), that trial counsel Ron McWilliams was ineffective in failing "to argue a defense, because he presented none," and Claim 3(b), that counsel was ineffective for failing "to suppress by oral argument." (Dkt. 25.) Petitioner's "Supplemental Petition" was filed on May 28, 2019. (Dkt. 29.)

### 1.    Claim 3(a)

#### A.   *Amended Allegations and Case History*

In the Supplemental Petition, Claim 3(a) has been renumbered as Claim 1. Petitioner alleges that both trial counsel, Bryninn T. Erickson and Ron McWilliams, failed to subject the prosecution's case to meaningful adversarial testing by not presenting a defense, based on the following:

(a) not objecting to Officer Kainz' testimony and not cross-examining him properly;

(b) asserting in opening statement that Krystn made up the story that Petitioner solicited her and her boyfriend Jose to help Petitioner murder Edgar, and not bringing forward any evidence to prove that theory;

(c) lack of preparation for trial and not presenting documentary evidence or witnesses;

(d) using ineffective cross-examination techniques; and

          (e) failing to move for a mistrial on prosecutorial misconduct
          in closing argument.

(Dkt. 29, pp. 5-11.)

The Court's purpose in permitting Petitioner to file an amendment was to clarify the factual and legal bases of the claims to ensure that they were raised in state court proceedings. After attempting to match Petitioner's subclaims to the claims brought before the Idaho Supreme Court, this Court concludes that the only possible state post-conviction appellate claim that could have been the state counterpart to exhaust the "failure to present a defense" claim in the Supplemental Petition is the claim that counsel refused to permit Petitioner to testify at trial.

Particularly, on post-conviction review, Petitioner alleged that he wanted to testify at trial, but his trial attorneys "stood firm and persuaded [him] they knew best and talked him into waiving his right to testify." (State's Lodging D-1, p. 11.) The state district court determined that the facts presented by Petitioner showed that he and his counsel had a discussion about whether he should testify, and then his counsel decided that he should not. The state court reasoned that the discussion demonstrated that counsel's decision was due to a reasonable trial strategy, rather than deficient performance. (State's Lodging C-1, p. 66.)

The state district court alternatively denied the claim for failure to show any prejudice. (*Id.*) Petitioner disclosed in his post-conviction papers that he would have testified that he did not know anything about the conspiracy and that Krystn and Jose were participants in various car thefts. (State's Lodging C-1, p. 66.) The state district

court concluded that the proposed testimony was "not sufficient to rebut the testimonial and physical evidence of Petitioner's guilt," and, therefore, the outcome of the trial would *not* have been different had Petitioner testified. (*Id*.) The state district court summarily dismissed this claim in Petitioner's post-conviction matter. (State's Lodging D-1, pp. 23-29.)

Petitioner included this claim in his pro se brief on appellate review. (State's Lodging D-1.) However, the Idaho Court of Appeals determined that Petitioner's brief lacked relevant authority or argument, and it would not accept his attempt to provide such support in his reply brief—because considering the late presentation of new information was contrary to state appellate rules. "When issues on appeal are not supported by propositions of law, authority, or argument, they will not be considered," declared the Idaho Court of Appeals. (State's Lodging D-4, p. 2.) Nothing in that court's opinion suggests that it considered the merits of his claims. The state appellate court simply affirmed the state district court's decision on all claims because of Petitioner's deficient briefing.

### B. Discussion

Accordingly, because Claim 3(a) was procedurally defaulted and not addressed on the merits by the state appellate court, it is also procedurally defaulted in this Court. Rather than entertain a cause-and-prejudice argument from Petitioner (and he has made no effort to present one), the Court will address the merits of the claim, because, even if it had been presented in a procedurally proper way, it is subject to denial based upon the record in this matter.

Federal courts are not required to address a procedural default issue before deciding against the petitioner on the merits. *Lambrix v. Singletary*, 520 U.S. 518 (1997); *cf. Franklin v. Johnson*, 290 F.3d 1223 (9th Cir. 2002) ("courts are empowered to, and in some cases should, reach the merits of habeas petitions if they are, on their face and without regard to any facts that could be developed below, clearly not meritorious despite an asserted procedural bar") (appellate context); *Hudson v. Jones*, 351 F.3d 212 (6th Cir. 2003); *cf.* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

*Strickland v. Washington*, 466 U.S. 668 (1984), governs claims of ineffective assistance of counsel. There, the United States Supreme Court determined that to succeed on an ineffective assistance claim, a petitioner must make two showings: (1) that counsel's performance was deficient because it fell below an objective standard of reasonableness, and (2) that the petitioner was prejudiced by the deficient performance. *Id*. at 684.

In assessing whether trial counsel's performance fell below an objective standard of competence under *Strickland*'s first prong, a reviewing court must view counsel's conduct at the time the challenged act or omission occurred, making an effort to eliminate the distorting lens of hindsight. *Id*. at 689. The court must indulge in the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Id*.

The *Strickland* Court outlined how to use the factors of deficient performance and prejudice to assess an ineffective assistance claim:

> These standards require no special amplification in order to define counsel's duty to investigate, the duty at issue in this case. As the Court of Appeals concluded, strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

466 U.S. at 690-91.

Prejudice under these circumstances means there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id.* at 684, 694. A reasonable probability is one sufficient to undermine confidence in the outcome. *Id.* at 694.

A petitioner must establish both incompetence and prejudice to prove an ineffective assistance of counsel case. 466 U.S. at 697. On habeas review, the court may consider either prong of the *Strickland* test first, or it may address both prongs, even if one is deficient and will compel denial. *Id.*

Petitioner asserted in his reply brief (that was not considered by the Idaho Court of Appeals, but has been considered here) that Krystn and Jose were "attempting to cover up a crime of vehicle theft and an attempt to hold up and rob Edgar [the] alleged victim at

gunpoint." (State's Lodging D-3, p. 2.) The question here is what facts did Petitioner know first-hand that would have aided his defense? If Petitioner had taken the witness stand, he would have been limited to testifying only to facts within his knowledge—not to what Krystn and Jose's thoughts and intentions were. This Court agrees with the state district court that Petitioner has not provided enough facts to show that his testimony at trial would have outweighed the other evidence pointing to him as the mastermind of the conspiracy to steal Dania's car and kill Edgar.

As to Petitioner's ties to Dania, the record shows that Petitioner was upset that Dania was spending time other men, including her former boyfriend Mateo (Matthew) and Edgar; that Dania had to obtain a restraining order against Petitioner when she first began a relationship with Mateo; that Petitioner had an extra key to Dania's car; that Petitioner admitted to police that he had driven by Dania's house the day her car was stolen and that he otherwise kept abreast of who she spent her time with; that Krystn and Jose had no relationship with Dania and knew of her and had access to her car only through Petitioner; and that Petitioner knew Edgar only because he was a friend or boyfriend of Dania.

As to Petitioner's ties to Edgar, the record shows that several persons had heard Petitioner say he was angry with Edgar and wanted to beat him (Katherine Santos) or kill him (Jose and Krystn). (Dkt. 29-1, p. 2 & State's Lodging A-2.) Krystn and Jose did not know who Edgar was, and Petitioner has brought forward no facts about how or why they would have selected him as their robbery victim unless Petitioner was involved.

If Krystn and Jose were planning to rob Edgar, there is little reason Krystn would have gone to Edgar's house alone and unarmed after he refused to meet her in the desert—because then Edgar would positively *know* her identity. Further, there would have been no reason for Krystn to call Edgar and tell him he was in danger—again, another action that revealed her identity—rather than simply leaving the failed robbery attempt in the past and hiding behind anonymity.

Further, if Krystn and Jose were car thieves and robbers, there would be little reason for Krystn to go to the police and implicate herself in a crime that is far worse than car theft—conspiracy to commit kidnaping and murder. After Krystn's disclosure to police, she was arrested for her part in the plot to kill Edgar. Her boyfriend, Jose, was arrested, charged, and sentenced to prison time. (State's Lodging D-3, p. 21.)

Petitioner's allegations that he was not involved in the conspiracy is not plausible. He has not brought forward sufficient facts showing that Krystn and Jose acted alone or that they had motive to frame him for murder instead of simply implicate him in the theft. For the same reason, Petitioner has not shown that he is actually innocent. To the contrary, what evidence there is points to Petitioner as the only person who had expressed an interest in harming Dania and Edgar, and the evidence found at his house corroborated the Krystn and Jose's stories. It is very clear from the record that Krystn and Jose were easily-led pawns in Petitioner's plan for revenge against Dania for breaking up with him, and that, although friends and relatives described Petitioner as a kind and generous

person, he was also known to drink heavily, a habit that often clouds one's judgment. (State's Lodging A-2 & Exhibits to D-3, p. 24.)

Based on this record, the Court concludes that Petitioner's trial attorneys were not deficient in their strategy to omit Petitioner's testimony from their defense because it would have been more harmful than helpful, especially considering what the prosecution could have elicited from him on cross-examination; therefore, no prejudice resulted. Claim 3(a) (numbered 1 in the Supplemental Petition) will be dismissed as procedurally defaulted, and alternatively denied on the merits.

### 2. Claim 3(b)

#### A. *Amended Allegations and Case History*

Claim 3(b) from the original Petition is now Claim 2 in the Supplemental Petition. (Dkt. 29.) Petitioner alleges that trial counsel failed to move to suppress evidence at trial, namely the unlawful retrieval of the shotgun. This is one of the claims he brought in his post-conviction petition and again in his pro se briefing on appeal. As with the claim above, Petitioner failed to provide authority and argument, and, thus, the Idaho Court of Appeals did not consider the claim but summarily affirmed the district court's decision to deny the claim.

Petitioner asserts that his Fourth Amendment rights were violated when Officer Kainz asked Krystn to return to Petitioner's house and retrieve the shotgun that allegedly was to be used to kill Edgar. Petitioner argues that Krystn had already moved out of Petitioner's house and was trespassing when she re-entered at Kainz' behest. Petitioner

asserts that his attorneys were ineffective when they failed to file a motion to suppress the

shotgun.

The state district court relied on *State v. Robinson*, 277 P.3d 408 (Idaho Ct. App.

2012), as the standard of law to determine whether a suppression claim would have been

successful:

> A third party may consent to a search, thereby relieving the government of the warrant requirement, as long as such person possessed authority—either actual or apparent—to consent. *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242, 249–50 (1974); *State v. Dominguez*, 137 Idaho 681, 683, 52 P.3d 325, 327 (Ct.App.2002). Actual authority to consent exists if the third party shares with the defendant common authority over or other sufficient relationship to the premises or effects sought to be inspected. *State v. Brauch*, 133 Idaho 215, 219, 984 P.2d 703, 707 (1999). As the United States Supreme Court explained:
>
>> Common authority ... rests ... [upon] mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Id*. at 412 (internal citations omitted in district court opinion).

### B.  Discussion

The Court finds it helpful to compare the facts of *Robinson* and other similar cases

to the facts in Petitioner's case to conduct a thorough analysis. In *Robinson*, Mr.

Robinson's nephew, Mr. Daigneau, lived in in a separate bedroom in Mr. Robinson's

house. Mr. Daigneau was on probation. Officers had reason to believe a convicted felon

was inside the house. Mr. Daigneau's girlfriend opened the door, and officers entered and performed a "sweep." In Mr. Robinson's bedroom, police found drug paraphernalia on the dresser. Mr. Robinson was criminally charged for the paraphernalia and moved to suppress the evidence. The state district court and court of appeals determined that, while Mr. Daigneau had actual authority to consent to a search of his own bedroom and the common areas of the home, he did not have authority to consent to a search of Mr. Robinson's room. *See* 277 P.3d at 408-16. The paraphernalia evidence was suppressed.

Here, the question is slightly different—whether Krystn could authorize a search of a bedroom she was moving out of or had just moved out of. The police reports reflect that Krystn and Jose told detectives that, for approximately one to one-and a half months, they had lived with Petitioner. After learning that they were homeless, Petitioner had offered them a place to stay in his home. Krystn rented a trailer home in nearby Meridian from her mother on June 10, 2011.

In the late evening of June 12, 2011, Jose told Krystn to wait for him at Petitioner's house. Petitioner dropped Jose off at Dania's house, and Jose stole Dania's car, using a key provided by Petitioner. Some of Krystn's personal items were still at Petitioner's house on that date. When Jose returned with Dania's car, he told Krystn to pack up enough clothes for a few days. She packed up some of her clothes and got into the car.

On their way to Meridian, Jose was traveling too fast in the car, lost control on a turn, and drove the car into a ditch. The two abandoned the car containing Krystn's

clothing, and Jose called Petitioner to pick them up. The three of them returned to

Petitioner's house. Krystn and Jose drove Krystn's car from Petitioner's house to the

trailer in Meridian in the early morning hours of June 13, 2011. Shortly thereafter, Jose

wanted to return to Petitioner's house to get some blankets and drive by the accident

scene again. They did so. They got back to Petitioner's house sometime between 1:00 and

3:00 a.m. [4] (State's Lodging D-3, pp. 14-40.)

Much later that same day, at 2340 hours (11:40 p.m.), Officer Kainz was

dispatched to the Nampa Police Department lobby to interview Krystn Sanchez. (*Id*., p.

29.) During that interview, Kainz gave Krystn a voluntary witness statement to complete,

and she did so. (*Id*., pp. 30 & 42-43.) Krystn dated her written witness statement June 14,

2011, which corresponds with the date(s) and time of Kainz' report of the interview

(having started just before midnight on June 13). On the statement form, Krystn indicated

that she lived at her trailer in Meridian. She wrote that she and Jose drove around with a

loaded gun looking for the murder victim, Edgar, on a certain (illegible) date. On the day

Krystn wrote her statement, Kainz asked her if she would return to Petitioner's house to

get the gun she had left hidden in the bedroom. She said she would, and she was able to

do so without protestation from Petitioner. (*Id*.)

Also supporting the position that, on June 13, Krystn continued to have joint

access or control of the common areas of Petitioner's house and her bedroom is a

---

[4] Petitioner asserts that Krystn was lying when she told the detective that Petitioner and Jose did not know where Krystn's trailer was, but it appears that he is simply misreading the transcript. The transcript appears to reflect that Krystn told the detective that Petitioner did not know where Krystn's friend lived in the area. (Compare State's Lodging D-3, p. 6 with pp. 30-31.)

**MEMORANDUM DECISION AND ORDER - 16**

transcript of a police interview with Officer Palfreyman on June 18, 2011. In that interview, Krystn said that she and Jose had moved out of Petitioner's house "approximately five days ago," which corresponds to June 13 or 14, the same time period in which she retrieved the gun. (State's Lodging D-3, p. 14.)

Petitioner counters that, on June 14, when Krystn entered his house to retrieve the gun, (1) she had been moved out of the house for three or four days; (2) even though she had a key to his house on his car's key ring, she was not supposed to enter his house without first asking his permission; and (3) that she was allowed to use his truck if needed, provided that she brought it back to him when he called her. Petitioner asserts that simply because Krystn had legal right to *move into* the Meridian trailer on June 10 and she retrieved the gun from his house on June 13, that sequence cements his case. However, Petitioner admits that "at this point [he] had not even entered the room they [slept] in, and had no idea what was left or taken." (State's Lodging D-3, pp. 2-3.)

Applying *Robinson*, the state district court in Petitioner's post-conviction case reasoned as follows:

> The facts indicate that despite renting the trailer in Meridian, Krystan still lived at Petitioner's house at the time she retrieved the gun. She had belongings in the house, had stayed there by herself while Petitioner and Jose went to steal Dania's car, and been in and out of the house in the 24 hours before she retrieved the gun, by herself, with Jose, or with Petitioner, at all hours of the day and night. As such, she was a person who had actual authority to consent to a search of the common areas and her bedroom.
>
> Because Krystan had the apparent or implied authority to allow the officers to search the room in which she was staying with Jose, it does not matter whether she retrieved the

gun or whether law enforcement officers retrieved the gun. The fact that Petitioner now claims Krystan did not have permission does not rebut the record in this case nor does it create a genuine issue of material fact about whether Krystan had actual authority to consent to a search at the time of these events.

Because officers could have searched Krystan's room, there was no legitimate basis for a motion to suppress the shotgun, nor does it appear the motion would have been successful. As such, there was neither deficient performance nor prejudice.

(State's Lodging D-3, p. 62.)

This Court agrees that the evidence would *not* have been suppressed had a motion been filed, because the least common denominator in this legal equation is not whether Krystn had actual authority, but whether she had apparent authority such that police officers could reasonably conclude that she had continuing authority to enter her bedroom in Petitioner's house. As the United States Supreme Court explained:

> [D]etermination of consent to enter must "be judged against an objective standard: would the facts available to the officer at the moment ... 'warrant a man of reasonable caution in the belief'" that the consenting party had authority over the premises? *Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). If not, then warrantless entry without further inquiry is unlawful unless authority actually exists. But if so, the search is valid.

*Illinois v. Rodriguez*, 497 U.S. 177, 188–89 (1990).

In a case involving a consenting party moving out of the searched premises—

*United States v. Wright*, 838 F.3d 880 (7th Cir. 2016)—the defendant argued that he and woman named Ms. Hamilton broke up shortly before the search occurred, and Ms. Hamilton was in the process of moving out of his apartment when she wrongfully

authorized the police search; particularly, he argued that she did not have authority to

consent to a search of his desktop computer. The court rejected the defendant's motion to

suppress, reasoning:

> [T]he end of a romantic relationship doesn't automatically
> mean that common authority over shared property has been
> revoked. *See United States v. Ryerson*, 545 F.3d 483, 488 (7th
> Cir. 2008). If the ex-partner "continue[s] to access, use, or
> control the property," as Hamilton did, she continues to
> exercise authority regardless of the relationship's status. *Id.*

*Id.*, 838 F.3d at 886.

Similarly, in *United States v. Matlock*, 415 U.S. 164 (1974), which was quoted in

part by the *Robinson* court, the United States Supreme Court explained:

> Common authority is, of course, not to be implied
> from the mere property interest a third party has in the
> property. The authority which justifies the third-party consent
> does not rest upon the law of property, with its attendant
> historical and legal refinements, *see Chapman v. United
> States,* 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961)
> (landlord could not validly consent to the search of a house he
> had rented to another), *Stoner v. California*, 376 U.S. 483, 84
> S.Ct. 889, 11 L.Ed.2d 856 (1964) (night hotel clerk could not
> validly consent to search of customer's room) but rests rather
> on mutual use of the property by persons generally having
> joint access or control for most purposes, so that it is
> reasonable to recognize that any of the co-inhabitants has the
> right to permit the inspection in his own right and that the
> others *have assumed the risk that one of their number might
> permit the common area to be searched.*

*Id.* at 172 (emphasis added). *See also United States v. Penney,* 576 F.3d 297, 308-09 (6th

Cir. 2009 (quoting *Matlock*) ("the absence of formalized property rights does not

automatically translate into the absence of common authority").

In *United States v. Gillis,* 358 F.3d 386 (6th Cir. 2004), the Court affirmed a girlfriend's apparent authority to consent to a search of her boyfriend's residence even though officers knew she (1) had left the home several months prior; (2) did not possess all keys to the residence; and (3) resided at another address at the time she gave consent. *Id.* at 391. There, the court concluded that officers possessed a reasonable belief that the girlfriend could consent to search because she advised officers that she lived at both residences, had been at the residence in question the morning she provided consent, and gave detailed information about the property, including where the defendant allegedly hid drugs. *Id.*

A case quite similar to Petitioner's is *United States v. Clay*, 1 F. Supp. 3d 688 (E.D. Ky. 2014), *aff'd,* 630 F. App'x 377 (6th Cir. 2015). There, Ms. Mitchell—a girlfriend who gave authorities consent to search her former boyfriend's apartment at Leawood Drive # 12—had already decided to move out of the apartment before giving consent. She had removed some belongings from the home, and she did not intend to return to the home as a resident. On the consent form, she listed her grandmother's address as her home address, rather than her boyfriend's apartment. *See id*., pp. 702-05.

On these facts, the court reasoned that Ms. Mitchell did not have actual authority to consent, but had apparent authority:

> [W]hen signing the consent to search form, Mitchell could not and did not, by her own testimonial description [of the facts noted directly above], have "common authority" over Leawood Drive # 12.
>
> Importantly, Frankfort police did not encounter such clarity on the day in question. Indeed, the Court finds that

Mitchell displayed apparent authority to consent. Mitchell told police that she had lived with Defendant since February 2013. *Id.* at 64 (Sergeant Quite testifying that "[s]he said she lived with Mr. Clay on Leawood since February of this year."); Government's Hearing Ex. No. 7 ("I lived there with him since February 2013.").

\* \* \*

In summary, Mitchell's name might not have been on the lease and she did not have a key, but she did affirmatively represent that she had lived at the Leawood apartment with Clay for several months and was willing to sign a form declaring it her premises.

*Id.*, pp. 703-04, 696. The court denied suppression because Ms. Mitchell "claimed presence and continuing domicile at the residence." *Id.* at 705.

In this case, it is undisputed that Krystn (1) had multiple items of clothing at Petitioner's house on June 12, because they were found in Dania's wrecked car on June 13; (2) had other items at Petitioner's house during that same time frame, such as the blankets, and had no instruction from Petitioner to remove them by a date certain; (3) had possession of Petitioner's truck and his house key on June 14, when she drove his truck back to his house and retrieved the weapon for police; and (4) was able to freely enter when she arrived at the house to retrieve the gun.

Although Krystn gained legal possession of her trailer home on June 10, that does not definitively mean that she could not still come and go from Petitioner's house after that date, and, in fact, she continued to come and go freely—in Petitioner's truck and with his keys. Given these facts, Petitioner could not persuasively argue that he had not *assumed the risk* that Krystn or Jose might drive back to his residence in his car and re-

enter with his key, on their own or at the behest of police, to retrieve the rest of their items or things related to the conspiracy.

Important to the analysis here is the fact that Claim 3(b) is not a stand-alone suppression claim, but a suppression issue enveloped in an ineffective assistance of counsel claim. Therefore, in determining whether to request a suppression hearing, defense counsel would have had to gauge the benefits of such a hearing against the detriments that it might later produce. First, it is not likely that the motion to suppress would have been a successful.

Second, the testimony may have had broader implications for the defense. That is, to counter the testimony of Jose and Krystn about when and why they continued to return to Petitioner's house, Petitioner likely would have had to testify about many of the same facts that implicated him in the crimes for which he was charged. The suppression hearing testimony would have been admissible as impeachment evidence at trial if Petitioner had testified contrarily. Even if Petitioner testified at the suppression hearing but did not testify at trial, the prosecution still could have gleaned important inculpatory facts from the evidence presented at the suppression hearing. Therefore, Petitioner has not shown that counsel performed deficiently in not filing a motion to suppress the gun.

Furthermore, even if the gun had been suppressed, Petitioner still has brought forward sufficient evidence to show that the verdict would have been different, given (1) the inculpatory testimony of all the other witnesses, (2) the obvious motive that Petitioner had to harm Dania and Edgar; and (3) the physical evidence, such as the spent shot gun

shell, iron bar, and duct tape that police obtained from Petitioner's home when he himself

consented to a search. Thus, admission of the gun was nonprejudicial.

Based upon this analysis, the Court concludes that Claim 3(b) is subject to

dismissal on procedural default grounds and alternatively subject to denial on the merits

for failure to meet either prong of *Strickland*. Having disposed of all of Petitioner's

claims, the Court will dismiss this entire case with prejudice.

## ORDER

1. Petitioner's written request for a copy of Respondent's lodging of the state court
   record (Dkt. 31) is DENIED as moot.

2. Respondent's Motion for Summary Dismissal (Dkt. 12) is GRANTED, and all
   claims are DISMISSED with prejudice.

3. The Court does not find its resolution of this habeas matter to be reasonably
   debatable, and a certificate of appealability will not issue. *See* 28 U.S.C.
   § 2253(c); Rule 11 of the Rules Governing Section 2254 Cases. If Petitioner files a
   timely notice of appeal, the Clerk of Court shall forward a copy of the notice of
   appeal, together with this Order, to the United States Court of Appeals for the
   Ninth Circuit. Petitioner may seek a certificate of appealability from the Ninth
   Circuit by filing a request in that court.



DATED: February 21, 2020

B. Lynn Winmill
U.S. District Court Judge